UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | CASE NO: 2:25-mj-04821-DUTY-3 |
| | CRIMINAL |
| vs. | Los Angeles, California |
| SHIWEI YANG, | Thursday, August 14, 2025 |
| Defendant. | (9:02 a.m. to 10:25 a.m.) |

DETENTION HEARING

BEFORE THE HONORABLE ROZELLA A. OLIVER,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff: AUSA JENNA LONG
United States Attorney's Office
312 North Spring Street
Los Angeles, CA 90012

For Defendant: MICHAEL S. CHERNIS, ESQ.
401 Wilshire Boulevard
12th Floor
Santa Monica, CA 9040

Mandarin-language Interpreter: Junting Tan

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: Eddie Ramirez

Transcribed by: Exceptional Reporting Services, Inc.
P.O. Box 8365
Corpus Christi, TX 78468
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**Thursday, August 14, 2025; Los Angeles, CA; 9:02 a.m.**

**(Call to Order)**

**THE CLERK:** Calling Case No. 25-mj-4821-3, United States of America versus Shiwei Yang. Counsel, please state your appearance starting with the Government.

**MS. LONG:** Good morning, Your Honor, Jenna Long appearing on behalf of the United States.

**MR. CHERNIS:** Good morning, Your Honor, Michael Chernis here on behalf of Ms. Yang, who is present in custody and being assisted by a Mandarian interpreter.

**THE COURT:** Good morning, Mr. Chernis. Good morning, Ms. Yang.

**THE DEFENDANT:** Good morning.

**THE COURT:** My first question for you is do you understand the Mandarian language interpretation being provided for you?

**THE DEFENDANT:** Yes.

**THE COURT:** If I could just ask the Mandarian interpreter please state your name and indicate that your oath is on file.

**THE INTERPRETER:** Mandarian interpreter Junting Tan also on file.

**THE COURT:** Thank you very much.

All right. Ms. Yang, we're here for the continued or the detention hearing. Where we left off last week, we'd

already gone through some of the paperwork and your attorney indicated that he or the parties indicated that they wanted to continue this to a later date.

Let me just check in with Mr. Chernis, have you received the updated pretrial services report?

**MR. CHERNIS:** Yes, Your Honor, but there's no update.

**THE COURT:** Right, right. Let me go ahead -- are you going to make argument or are you going to submit today?

**MR. CHERNIS:** I'm going to argue, Your Honor.

**THE COURT:** Okay. Very good. No, I just wanted to -- I'll go ahead and then ask Ms. Long to make the proffer and please proceed directly into the argument.

**MR. CHERNIS:** Yeah. And just to be clear, just so I'm not hiding the ball, I'm objecting to a detention hearing proceeding, I don't believe the Government is entitled to a detention hearing.

**THE COURT:** Yes, okay. That's -- I understood you. That's absolutely -- they are entitled. I understand the --

**MR. CHERNIS:** They are entitled, Your Honor, or you understand that's the question?

**THE COURT:** So my understanding is that, at least what's been made recently, the arguments that the defense bar is making is that raising the issue of whether or not there's a serious risk of flight as a threshold question. And I think -- it's been so long since I've been on bench duty, I think it was

maybe in April when I did a dive into this to just check out the recent Ninth Circuit case law, to see if there's any new case law that's emerging in light of changing circumstances. And I'm not persuaded by anything that's been presented to me.

If you have new argument that or, excuse me, new case law that's come out, I'm happy to take a look at it, but --

**MR. CHERNIS:** I'm not aware, Your Honor, that cases -- the case law has ever changed. I mean, the case law that I'm looking at which includes district court opinions from within the last couple of years, in fact I have one from June of this year, from the District of Ohio, the Chief Judge, Chief Magistrate Judge -- I'm sorry, not Ohio, Idaho, it's pretty clear that the Government has to satisfy the serious risk of flight threshold before we get to a detention hearing.

**THE COURT:** All right.

**MR. CHERNIS:** I'm not aware of any Ninth Circuit authority to the contrary.

**THE COURT:** All right. So you can absolutely preserve this and whatever the district -- whoever the district judge is, but why don't we go ahead and go into the proffer and the argument and then if you want to recap that, Mr. Chernis, absolutely.

**MR. CHERNIS:** Okay.

**THE COURT:** All right. Ms. Long.

**MS. LONG:** Thank you, Your Honor. And I might as

well for the record just actually lay out a few points about that entitlement to a hearing.

Your Honor, it's the Government's position that we are entitled to a detention hearing based upon our good faith proffer that there is a serious risk of flight involved in this case. The statute, as we all probably well know does not set a level that that has to be in any way proven by and there are some district court opinions in other districts, not here, and not even -- not the Ninth Circuit that has agreed to it in any way that has incorrectly, in our opinion, tried to apply something like a preponderance standard.

And the reason I say incorrect is because that defies statutory construction and the actual basis of the detention hearing versus the detention finding. It is absolutely logical that Your Honor is required to find by either a preponderance or clear and convincing evidence that no combination of conditions could either protect the community or ensure that the defendant appears as required. But by applying the same standard to a narrower term, which is serious risk of flight, it would actually reverse the stages of the detention hearing, whereas the hearing itself, is frankly a conversation. It's the chance for Your Honor to vet the information.

But irrespective of that, this is a case where even if a judge were to apply the incorrect legal standard and require a higher evidentiary showing than would be supported by

statutory construction, that would be met here. In part, because of the face of the pretrial services report, and also the nature of the offense.

So I'm going to start there, because -- sorry, before I get to that actually I will offer what we are going to proffer in support of those arguments, which would be the pretrial services report, it's determination and recommendation, both the initial one and the update that was issued yesterday, as well as the complaint and the underlying affidavit, a redacted version of which is the publicly available document.

And as that affidavit lays out, this is at a basic level, an international expert scheme by multiple people working in a conspiracy to export items to a foreign country that shouldn't be. That alone, establishes some significant risk of flight concern.

But then if you actually take into account defendant's own particular circumstances --

**THE COURT:** Hold on just a second, if you could.

**THE INTERPRETER:** Your Honor, may I just (inaudible)?

**THE COURT:** Yes, absolutely.

**MS. LONG:** When did she stop understanding? I can back up.

**THE INTERPRETER:** One sentence.

**MS. LONG:** Okay. So the case itself being an

international conspiracy to export controlled items to a foreign country speaks to the serious risk of flight itself. But then if you take into account defendant's own particular circumstances, any concern for flight amplifies, it's not decreased.

As you might recall when you mentioned at the beginning of this, the parties were in agreement to continue this detention hearing, because frankly the Government was hopeful that Ms. Yang could produce things that weren't in the pretrial services report that would mitigate the risk of flight we saw. And instead, there hasn't been additional information.

So what the Court is left with is pretty significant, in terms of the absolute lack of reason to believe that Ms. Yang would return to court as required. First, none of the information albeit sparse is verified, because no one has been able to verify that information for Ms. Yang.

The information that we do know is the sworn to allegations in the complaint which includes Ms. Yang's direct involvement in the international scheme, as well as the fact that she has no legal status here in the United States, because she is a visa overstay.

Beyond all of that, Your Honor, she doesn't have close ties to this community. She's only lived in this community for two years. Her residence is the criminal location. It is the very warehouse and office that is the base

of the export scheme, as sworn to in the affidavit and detailed there.

Beyond that, before those two years, the only two years she's been here, she was in a different district but also only for two years. And before that, another district for six years. Ms. Yang has no close ties to this community or even another district that could potentially give Your Honor faith that she would have a tie there.

Beyond that, the only individual that was in the original pretrial services report that was proffered as a potential source to verify information or a better resource was a co-defendant, which I don't think I need to spend much time on how that would be potentially inappropriate.

Beyond that though, it's significant that there isn't someone who could be the person to ensure that she comes back with a closeness here, and as a result, there are no bail resources in front of Your Honor from a third party and none that would be secured. And the Government hasn't been given any information of an individual or assets that could be used to secure them.

And, Your Honor, what I'll end with is a very significant thing from the pretrial services report and I'm sure Mr. Chernis will speak to this and I'm sure the parties will disagree to some degree about the seriousness of this, but while this is a second arrest of Ms. Yang, she doesn't have any

prior convictions. She does have an outstanding warrant from the other time she's been arrested, and it was from a driving under the influence charge where someone was injured here in California in this district. That speaks to danger, but the warrant also speaks to a significant risk of flight, because that's already a case in which she has failed to appear in a way that is ordered.

It's my understanding and I don't want to jump in front of Mr. Chernis' argument, but the claim would be that she showed as required, they didn't have the documents ready and when they were ready, a notice was mailed to her, but to an address that she wasn't staying at.

But she doesn't have a DMV history, which means that that address was the address she chose to give to the police. So the fact that a notice was sent to an address that she wasn't at, if it's the address she gave, that speaks to her failure to appear and her attempts to evade law enforcement and consequences.

And she also had an obligation and a duty to follow up on that, especially a serious charge like a driving under the influence where there was injury. So that warrant, it's the Government's position, still speaks volumes to the risk of flight and the risk that this defendant wouldn't appear as required before this Court.

Given all of these facts and nothing mitigating

those, the Government concurs with pretrial services recommendation that at least at this point, the defendant needs to be detained under the law. That could be revisited if we can clarify some of these things, including potential assets or sureties or other things and the Government would be open to that continued conversation, but as of today, we have nothing that we can come to an agreement on.

**THE COURT:** All right. Thank you. Mr. Chernis.

**MR. CHERNIS:** Yeah. Before I get to my argument on the Government's failure to even have a hearing, let me just put to rest the concern about the warrant, which is really a non-issue, Your Honor. And had pretrial services dug a little deeper they would have found what I found.

Ms. Yang was stopped, I guess arrested in January of 2024 for a DUI. She hired a lawyer. She was told on January 30th, 2024 we have declined to file charges, she was told that by the Los Angeles County District Attorney's Office and with your permission, Your Honor, I'll approach and give you a copy --

**THE COURT:** Of course, yes.

**MR. CHERNIS:** -- of the decline letter filed by the summary docket report from El Monte. So what looks like what happened is, the DA's office said we're not going to file charges, Ms. Yang thought that was the end of it. And then four months later, somebody else in the DA's office sends her a

letter and says, oh, we need you in court in May. And they sent the letter to an address in Arcadia that I'm not even sure what that address is for, but it's not where she was living.

So I communicated with her lawyer that was hired to handle this matter. Ms. Sunny Wang (phonetic). She too was perplexed by the fact that the charges were filed, she had no idea. And this is easy to clean up, Your Honor, this is Ms. Yang being released, going to court in El Monte, saying here I am, I didn't know, they clear the warrant, she deals with the case. This is a non-issue, Your Honor.

**THE COURT:** So it looks like the -- so I hear what you're saying on that, that there's confusion, but it looks like they've decided to -- they went ahead and papered the case.

**MR. CHERNIS:** They went in four months later and decided to file charges, but it doesn't mean Ms. Yang knew about it.

**THE COURT:** No, I hear that. No, I hear you on that.

**MR. CHERNIS:** I mean, this is not indicative of risk of flight.

**THE COURT:** No, I think, Mr. Chernis, I think it's -- I mean what everybody in the room sees, got unverified information and no bail resources, right, that's your big hurdle here.

**MR. CHERNIS:** I mean, I don't think it's my hurdle,

Your Honor, again I don't think the Government is entitled to this hearing and I'm just going to make my record on the issue.

You know, the default provision in 3142 is bond on an unsecured appearance bond, the default is not detention. And there are a number of district court opinions, including from this district, from this circuit that recognize this is a two-step process.

First, the Government demonstrates a serious risk of flight. And if they do so, then we get to the question of whether there are conditions or no conditions. And there are three cases in particular, Your Honor, I can give you copies, I can cite you to them.

The most significant case is this case out of the Northern District, I'm sorry, out of the Middle District of Tennessee, U.S. v White from 2021. And that case has been relied upon by at least two district court opinions in this circuit.

**THE COURT:** Did you say Tennessee?

**MR. CHERNIS:** Yes, I can give you a copy, Your Honor.

**THE COURT:** Do you have a copy for the Government?

**MR. CHERNIS:** Yes.

**MS. LONG:** Thank you.

**MR. CHERNIS:** You're welcome. So White is the seminal case in the area, even though it's a district court opinion, it's a case that's been cited repeatedly for the

notion of a two-step process.

The Government has to demonstrate by a preponderance of evidence that there is a serious risk of flight and it emphasizes that serious risk of flight is different than just a risk of appearance. It is a subset of risk of appearance or risk of non-appearance. It is a more purposeful failure, so it's a more specific issue that there's been a series or that the Government demonstrates a serious risk of flight.

And then the other case that I want to give Your Honor and the Government is from the district -- a case that I mentioned a moment ago, the District of Idaho, I misspoke, it's from 2023, Figuero Alvarez (phonetic) where the chief magistrate judge there references the White case as the seminal case, and again adopts this two-step inquiry. Has the Government demonstrated a serious risk of flight, is it entitled to a hearing.

And the Court doesn't -- as White says, the Court may not find the case involves serious risk of flight just because the Government claims it so. The Court has to make its --

**THE COURT:** Can I ask you something? Can I ask you something?

**MR. CHERNIS:** Yes.

**THE COURT:** I think that if you could -- Ms. Long addressed what I think is often the sticky issue about how at the two step, it's almost as if you -- it's just redundancy

built into, right. Like so you have to make this threshold argument before you make the -- before the Court has heard the --

**MR. CHERNIS:** No, Your Honor, that's not what White says and that's not what the cases say. What these cases say is you do -- you obviously have to have a hearing of some sort to determine whether the Government has met the threshold issue of serious risk of flight. And in that hearing, in that discussion, you're going to address these factors that the Government claims --

**THE COURT:** Can I ask you this, right, I don't know if -- and I really appreciate -- I welcome the back and forth, because in the time that I've been in this job and then previously it's like comes in cycles, like people -- you know that, Mr. Chernis, you've been --

**MR. CHERNIS:** It's hard to keep up with all this stuff, it's complicated also.

**THE COURT:** Well, and I don't -- sometimes I come to court and I feel like this issue is raised again and I often wonder like is something percolating out there, right, is there a Ninth Circuit decision. It looks like these are recent decisions, so maybe there is something where folks really want to take another serious look at it, but again as you know, Mr. Chernis, it's like every day, five days a week, 58, we see it all around the court, like we go through this. And I'm

happy, like you absolutely make the record because it seems to me one takeaway it'd be great if this issue were just put to rest, right, and we had clear guidance from the Circuit, that it should be a clear demarcated two part hearing.

But all the times that I've been confronted with this, maybe not as many as you, it's a collapsed hearing, right, it's collapsed, where the Court has to hear from the Government about everything, and maybe wrongly out of expediency or efficiency, especially when you're in the duty courtroom, you just ask the Government like I did, let's just hear your argument, right. Because I can't make the determination about serious risk of flight, and I get the intellectual rigor that you're asking for, right. But let's hear what the Government is going to say before you make the serious risk of flight analysis. But it does seem that it's collapsed. And --

**MR. CHERNIS:** Let me put Your Honor -- your concerns to rest, Your Honor. I am not suggesting that we need to have two hearings.

**THE COURT:** Or two parts of the hearing.

**MR. CHERNIS:** I'm not suggesting that either.

**THE COURT:** Okay.

**MR. CHERNIS:** I think what these cases say is that in order to evaluate the serious risk of flight to determine if the Government's met its threshold, you have to have a

discussion, you have to have facts, you may have to have testimony.

And after you hear that, you may -- the Court may make the determination, I've heard enough, you know, now what are those conditions that the Government -- that the defense might have to offset these concerns, or the Government or the Court may get to the point, you know what, this is not enough. And it's not -- as these cases say, there's not like a magic, you know, quantum that the Government has to hit, it's not a number.

But -- and I appreciate what you're saying that in duty days, and you know, we just kind of ignore this and we conflate them --

**THE COURT:** Well, I think it's because you hear the argument and let's say that you determine that bail conditions, there are a set of conditions. And then so you're making the determination, I suppose, maybe -- if I made the determination hypothetically there's no flight risk.

**MR. CHERNIS:** No serious risk of flight.

**THE COURT:** No serious risk of flight.

**MR. CHERNIS:** Right.

**THE COURT:** That there's no serious risk of flight, but I've had the hearing.

**MR. CHERNIS:** It's okay, because now you're determining that we don't have to get to conditions. It's

really about, does the defense have to come up with conditions to demonstrate that the Government can't show there's no reasonable conditions that will assure, et cetera.

I understand it's conflated, I understand it's collapsed and I understand that a lot of people on my side of the aisle don't necessarily make this point, but also a lot of the cases that we're dealing with, they're presumption cases for example. They're drug cases, like there's no question that the Government is entitled to get to a hearing.

I mean, honestly, like this is the only first or second case I've had this year where there wasn't a clear basis for a hearing, other than, you know, they weren't relying on serious risk of flight.

But needless -- you know, I'm going to get into what the Government is saying or the issues that they --

**THE COURT:** Right, right.

**MR. CHERNIS:** -- think demonstrate serious risk of flight --

**THE COURT:** But here, right, implicit in this it's a national security, right, it's national security. I think, isn't there -- is there some --

**MR. CHERNIS:** Your Honor, it's computer --

**THE COURT:** -- the flight. I'm addressing Ms. Long. Was -- did anybody else --

**MR. CHERNIS:** It's computer chips. It's computer

chips. These are computer chips --

**MS. LONG:** I'm sorry, I couldn't hear the end of your sentence because he started speaking over you.

**THE COURT:** Let me let -- I'll come back to you.

**MS. LONG:** Okay.

**MR. CHERNIS:** I'll address, Your Honor, the Government's points, what they think demonstrates serious risk of flight, but I think the main -- the bottom line of these cases is that while we might conflate the hearing and the discussion of the factors that arguably demonstrate serious risk of flight, the -- there is a threshold determination that the Court has to make, serious risk of flight is not something just to be skipped over and blended with like risk of non-appearance. And we don't have to come up with conditions. It's just a separate way of looking at it.

But in any case, this is what the pretrial services and the Government is relying on as their factors or their basis for saying serious risk of flight. One, she's a Chinese national that overstayed her visa. That by itself does not mean she's a serious risk of flight. And that case I gave you and there's another case I'll cite to in a minute, there are numerous cases with undocumented aliens that are given bond.

So the fact that she's a Chinese national and is undocumented is not by itself telling. In fact, there's a back story, Your Honor, as to why she's an undocumented alien. She

didn't come here as an alien, she didn't crawl over the border, she came here in 2015, ten years ago, to go to school at Temple University in Philadelphia.

She lived and went to school at Temple University until 2018. The pandemic struck. She remained living in Pennsylvania I think until 2021. So then she's living in that district for, as the Government says, for six years and then she moves to Delaware to live with some friends and then she was invited out to Los Angeles to work with her co-defendant, Twang. Am I saying that correctly?

Twan. So, you know, in the press release by the U.S. Attorney's Office, undocumented alien charged with exporting blah, blah, blah. She's not that. She's a student that came here and when her visa ran out, yes, she did not take the steps needed to continue her visa or keep it in line.

But -- so anyway, the notion that all she is is an undocumented alien or that's so significant I think it's overstated. The second factor that pretrial services points to is that she possesses a passport. Well obviously she's a foreign national and we can easily surrender the passport to calm that concern.

She has family ties in China. Of course she has family ties in China. She was born in China. But the truth of the matter is, she's more or less estranged from her parents and this gets into a little bit of a rabbit hole of Ms. Yang's

personal history but Ms. Yang is a lesbian woman. Her parents would not approve of her lifestyle, at least that's her fear, and it has sort of separated them and driven them a bit apart.

And the last time she was in China, Your Honor, was in 2018 by the way. She hasn't -- she's gone -- you know, she's gone long periods of time without communicating with her parents and although I think the pretrial services report says, they communicate weekly, the reality is it also says she can't remember the last time they spoke and Ms. Yang can't remember the last time they spoke. But all of that is even verifiable because it was all done by Weed Cheat, which is a text messaging system and it's in her phone.

So she's more or less, I don't want to say she's estranged from them, but they're not close. They don't even know about this case, Your Honor. So the fact that she has family ties in China is really not that meaningful. The reality is she's been living in this country for ten years and her strongest ties are to people in this country, in both Philadelphia, Delaware, and until recently here, most of whom are Chinese nationals but unwilling to come into court to vouch for her because they're afraid of the Trump administration and ICE and the consequences of that.

I spoke to three of her friends, three different people who would love to help her, who are concerned about her, but are terrified even though they're all here legally and they

have legitimate visas and jobs, they're afraid of retaliation. But they're ties and while the Government sort of dismisses it, her -- because he's a co-defendant, the person that she was charged with in this case is a longstanding friend of hers, he and his fiancé. They're the ones who brought her out here, they were her world out here.

And maybe now she can't rely on them for bond, but they're still ties. So it's not like she has no ties to the community. She has more ties to this country now than she probably has to her own country.

Pretrial services also points to her history of foreign travel as being a risk of non-appearance. She last traveled seven years ago, Your Honor, out of this country. And then, of course, there's the active warrant. We've spoke about, that she has no bail resources, I spoke about that.

So at the end of the day, I mean, what this is really about is the offense conduct by itself suggests that somehow she's a risk of flight and that she's undocumented. But, you know, if you look at the case I gave Your Honor, the Figuero Alvarez case and there's also another decision, I don't know that I have a copy, this is a 2025 decision. It's called -- let me see if I have a copy for the Court and for the Government.

I have one copy, Your Honor. I can give it to you. I can give it to the Government.

**THE COURT:** Well, you should always -- I think the proper etiquette is show it to opposing counsel first.

**MS. LONG:** What's that?

**MR. CHERNIS:** This is another district court opinion. It's similar to the Figuero Alvarez case. Both of these cases, Your Honor, I mean it's really interesting, both of these cases involve undocumented aliens, one person from Guatemala, one person from Mexico, they were arrested on illegal re-entry cases.

**THE COURT:** Say that, 1326?

**MR. CHERNIS:** 1326. But it was probably -- it's like some variation of that. And in both cases, the Courts go through these painstaking analyses of whether or not the Government has demonstrated serious risk of flight. And in both cases, the Courts say they hadn't, even in illegal re-entry cases, with people with multiple re-entries. And I'm not focusing on the two step point of it, I'm focusing on the fact that even in cases with undocumented people with limited criminal histories, Courts release people on bond and find that the Government has not met its serious risk of flight.

The point is, the point is, the fact that she's undocumented is not by itself a decisive factor and does not by itself surely show serious risk of flight. These cases, Your Honor, set out and I don't expect you to read these cases now, but the cases set out a four part analysis of whether or not

serious risk of flight is demonstrated. It looks at four things.

One is the incentives to flee; two is the ability to flee; three is the defendant's ties to the U.S.; and four is the defendant's reliability and trustworthiness.

And incentives to flee, you know, that looks at the crime and the potential consequences. Ability to flee looks at resources and whether the person has access to fraudulent identity documents or significant sums of money or if there's been recent U.S. travel -- I mean, recent foreign travel.

Ties to the U.S. is sort of self-evident, although it's interesting Figuero Alvarez says that the length of residence in the jurisdiction and the U.S., meaning the local jurisdiction and the U.S. generally both uninterrupted and cumulative bears significantly on serious risk of flight.

Alien defendants who have resided in the U.S. for many years are less likely to flee pending trial. This is especially true for alien defendants whose length of residence approaches or exceeds their length of residence in their home country.

Reliability and trustworthiness looks at prior instances of violating court orders and substance abuse, although substance abuse can cut both ways because on the one hand, substance abuse can suggest somebody who doesn't follow the rules. On the other hand, the Court seems to recognize and

this is again in the Figuero Alvarez it recognizes that people who have substance abuse problems often don't have the means to escape.

In any case, you know, these cases, both of these cases for similar reasons concluded that the Government had not demonstrated serious risk of flight with an undocumented alien, principally because there was scant evidence of an intent to flee, no evidence of an ability to flee as the defendant in Figuero Alvarez only had $4,500 in savings, no access or no evidence of prior use of fraudulent travel documents. No recent travel outside the U.S.

So I'm now going to go through an analysis of Ms. Yang's risk of flight factors under this four step approach. The first one, Your Honor, is whether there's an incentive to flee.

The only incentive to flee obviously is the incentive to avoid the consequence of this case. And the possible sentence in this case. But you have to bake into the analysis of incentive to flee, Your Honor, the weight of the evidence. And the weight of the evidence, as the Court knows, is always the least significant consideration because of the presumption of innocence.

But I would like to just emphasize that while it's allegedly a case of national security, my client was the low level employee working for this company ALX. She was not the

founder of this company, she was not the CEO of this company. The company was founded before she even came to Los Angeles by the first named defendant. She was invited out here in 2023 to work for the company.

And while there's reference in the complaint to information suggesting that she knew that the packages, these chips were being rerouted to China, there's no evidence yet that I'm aware of, that she was aware of these very, very technical licensing requirements.

I mean, remember, Your Honor, it's new to me, it's probably new to the Court, she wasn't transporting drugs, she wasn't transporting firearms, she was transporting or alleged to be transporting or shipping computer chips. Computer chips that are actually legal to sell to China if you have a license.

**THE COURT:** But I used to do before I left the U.S. Attorney's Office, I did export violations non-stop.

**MR. CHERNIS:** Oh, no.

**THE COURT:** Yeah. So.

**MR. CHERNIS:** Then you know a lot more about this than I do. I know only about as much as I get from reading the complaint, but from what I can gather, they're not illegal -- it's not illegal to sell them to China, you have to get a license, although it seems like no one's going to get a license right now to sell these chips to China, because they're so powerful. But they don't --

**THE COURT:** National security concerns too, right? I mean, I think part of the -- at least --

**MR. CHERNIS:** But that's just argument, Your Honor. I mean, even if you look at the complaint it talks about -- it doesn't really talk about national security, it talks about powering AI and powering computer games.

**THE COURT:** Well, I think -- but isn't it an IEATHA. Is it under IEATHA or what, or is it the other statutory scheme?

**MS. LONG:** It's not IEATHA, it's ICRA, Your Honor --

**THE COURT:** Okay.

**MS. LONG:** -- but the reason it's still ICRA is because these are the hyper sensitive chips that have dual use in both military and civilian operation and are the most controlled thing to go to China and it's the most recent semi-conductor like provisions and things like that that are controlling these chips because of those issues.

And so you're right, it is a national security control, but it doesn't fall under the IEATHA statutory construction.

**THE COURT:** Okay. So it's been a while, I'm very rusty then, but.

**MR. CHERNIS:** I was never even rusty. But my understanding is that, yes, these chips could have a military application, but there's -- I mean, they could also not, but in

any case --

**THE COURT:** So I do appreciate -- you know, one of the things too, I absolutely want you to make the record. One thing that comes across and you can lead this into the discussion is I do think this is an interesting issue and I would love to have it resolved. But the cases that you presented are, at least these two, I understand that they are others, but they're 1326 cases.

**MR. CHERNIS:** The consequences are not great.

**THE COURT:** So they're different, right? So what you have here is someone who, I don't know, maybe could be eligible for a 1325 but we're here on something out of status and then has, while here, out of status been charged with a national security -- violating a national security through an export.

I'm just saying, look, you're obviously very seasoned, and I always want to be transparent, it's not a 1326 case and that's what makes it different from the cases you presented. So please make sure you address that in the argument.

**MR. CHERNIS:** It's not a -- well, the only thing, Your Honor, that makes it different from the cases I presented is the consequences. And those cases are six months in prison, here they're a little bit more. I wish the Court would stop referring to it as a national security case.

**THE COURT:** Okay. I will.

**MR. CHERNIS:** It's a computer chip case. And the reality is --

**THE COURT:** But --

**MR. CHERNIS:** -- that Ms. Wang worked for this company. She sold computer chips at all different levels to people locally and she sometimes maybe helped somebody else pack packages that were going to Malaysia and ultimately to China. That doesn't make her a national security threat.

And as far as the consequences go, you know, I had a discussion with Mr. Scott, you know, about this. We have a slightly different view of what the guidelines consequences are. Apparently the governing guideline is 2(m)5.1. The default guideline is 14, which would ultimately mean no jail time in reality. There's also a potential to go to level 26 if the Government can show that there was evasion of national security controls.

But even then, Your Honor, even if it's a level 26, you know, Ms. Yang would be entitled to minus 3 for acceptance if she took a deal. She'd be entitled to a minus 2 for having no prior criminal history. She'd be likely entitled to at least a minus 2 for a mitigating role, now all of a sudden she's down that's eight levels or seven levels, she's down to a level 19, which is 30 to 33 months, which is maybe 26 months or 25 months in reality. And that doesn't even take into account any Booker material or who knows, maybe she cooperates.

So this could be a case of at worst 25 months in prison. Is that enough for her to become a fugitive for live? I don't know. But it's not that far off from six months in the re-entry cases. But this is just one -- I'm saying, Your Honor, like I wouldn't want to do six months, I wouldn't want to do two and a half years, but this is not a case that's presenting a risk of 15 or 20 years in prison.

**THE COURT:** Understood.

**MR. CHERNIS:** So that's why the re-entry cases while different, are not completely irrelevant. You're talking about undocumented people who are given bond and the courts find no serious risk of flight in part, including the fact that they're undocumented. And by the way --

**THE COURT:** And I interrupted you too. I want you to -- because you were going through your stuff and I apologize.

**MR. CHERNIS:** No, I'm still on the incentive to flee. You know, it's just one factor and according to these district court opinions, it's a totality test and I'm saying, number one, the evidence is not there to demonstrate that this woman actually understood these complicated regulatory schemes, which by the way I understand were changed only in 2022 to include these specific computer chips.

And I'm saying also that the consequences are not so severe that she would risk her life here, even though of

course, that is probably short lived anyway because of ICE. But also why would she be in such a rush to go back to China? She's a gay woman, they get even less fair treatment in China than they do here.

**THE COURT:** Well --

**MR. CHERNIS:** California at least gives her the kinds of rights that she would not have in China and she has family there that she's estranged from. So it's so easy to say, oh, she'll just go back to China, they'll just go back to Mexico, they'll just got back to Guatemala, but she's been living here for ten years. All of the people that she gave me, by the way, Your Honor, I can only proffer this, I can't prove it, because they've asked me to keep their names confident.

But all of the -- the three people that I spoke to as potential resources all live in the United States. She's not giving me people in China as potential bail resources. And it -- last but not least on this issue of incentive to flee, she didn't flee when she had the chance to flee. The search warrant in this case was executed at her home/office two weeks ago, July 30th on a Thursday. She was the only one at the warehouse when it was executed.

She was not arrested. She was allowed to leave. She left. She came back with her friend Twang to I think to pick up some belongings, the agents were still there. They let her come, they let her go. She went back to stay there again the

next night. It was only two days later that they arrested her.

So if she had this incentive to flee, why did she go back to the warehouse? Why didn't she flee when she had the opportunity?

The -- so, Your Honor, I suggest that the Government cannot demonstrate this incentive to flee that equals a serious risk of flight. The Government cannot show an ability to flee. She -- how is she going to flee, Your Honor, if she surrenders her passport? She doesn't have fake travel documents, at least the Government been able to allege or prove that.

There's no evidence of recent foreign travel. She has $5,200 in her bank account. How would she get out of this country without legitimate travel documents and without there being any evidence of access to false travel documents?

And as far as like trustworthiness, her only brush with the law was this issue in El Monte where she was told at least initially there would be no filing against her. She doesn't have a substance abuse problem, although the pretrial services report said she did, because she smoked marijuana a year ago. I have news for pretrial services, it is legal to smoke marijuana in California, but that's not a substance abuse problem.

So I maintain, Your Honor, that the Government cannot demonstrate a serious risk of flight. All of these factors, when you actually examine them, they just don't hold up. Like

the -- yes, she's accused of this crime, that involves a violation of the Export Act and computer chips, but it's not like she was doing it in cahoots with the Chinese government and they're going to welcome her back as a hero.

So again, Your Honor, I submit that they have not demonstrated risk of flight. So we don't even have to get to conditions. I'm happy to discuss conditions that I think would alleviate and certainly reasonably assure her appearance in court.

I wish I had a surety, Your Honor, it would make my life a lot easier.

**THE COURT:** It would, yes.

**MR. CHERNIS:** It really would, but circumstances are such that I don't and it's not any fault of Ms. Yang. She has people out there that are just terrified with what they see on the news.

**THE COURT:** All right. I'm happy at this stage then and I'm looking at the Figuero Alvarez, I'm skimming it. I haven't had a chance to look at everything.

**MR. CHERNIS:** Your Honor, I'm just going to hand up the Molina Orentos (phonetic) case which is from Oregon, April of this year.

**THE COURT:** Is it a 1326 case?

**MR. CHERNIS:** It is, but it's --

**THE COURT:** Okay.

**MR. CHERNIS:** You can forget that part, it just lays out the four steps -- the four factors that I was talking about --

**THE COURT:** Right.

**MR. CHERNIS:** -- that the courts used in analyzing the serious risk of flight. Intention to flee, ability to flee, community ties, and trustworthiness. And by the way, baked into community ties, Your Honor, is not just community ties in the local district, it's community ties nationally. And it's also recognition of the longer someone's living in this country, the less ties they have to the country that they left.

**THE COURT:** Right, right. You know, I'm just going to do it disorderly, obviously I don't have -- oh, go ahead. I apologize, Ms. Long.

**MS. LONG:** No worries, Your Honor. I just wanted to address a couple of things if I may.

**THE COURT:** Yes, of course.

**MS. LONG:** The first is that the -- it's not fair to say that the only difference between this and a 3126 and even the computer chips are national security, leaving all of that language aside, which I think I've already addressed and frankly you probably are more experienced than even myself in certain of those areas. But one of the big differences here is the nature of the offense related to the international ties.

The crime of a 1326 is you came into this country illegally, right, and a lot of the 1326 cases include people who haven't lived at their residence for two years in a district, but only came here to do the very job that is now the reason they're being accused of crimes, which is illegally to export things.

But in this case, the crime itself is using ways to get things to leave this country that are not supposed to leave the country that way. It is by repeatedly violating the laws of this country.

And to Mr. Chernis' point that there's no evidence that she knew, the complaint disagrees with that. There's a few things. The first is that there's actually text message conversations in which the owner of the company directed her to disassemble a server that is export controlled to get it to China. And beyond that, there's a text message chain that she's on, where when another co-conspirator asked, why not just send it directly to China of a different person, that person responded, because of the restrictions.

Not to mention these companies as you well know file a significant amount of documentation related to these exports. Ms. Yang was one of those people who filed that documentation, who signed for this company on this, including misclassifying things as to what they are and lying about their value and other things.

And when a shipment was detained because of the lie, it's Ms. Yang's e-mail that has a spreadsheet where the fake destination, Malaysia, the tran shipment, the next column says China for a couple of these controlled shipments, sent by UPS, claiming to be under the $2,500 threshold, so that they don't have to declare what's inside of it.

These chips are worth tens of thousands of dollars and are some of the most valuable property to the government and other people in China, attempting to combat the technology.

So the nature of the offense itself is international, but also serious risk of flight, there's no case law that implies at any point that the Government has to show that the defendant is fleeing to China. Here's risk of flight even under U.S. v White which has issues with the way it's cited to other cases, and is just the first of this kind of small loop that defense counsel have been arguing, which is White, Figuero Alvarez and now that District of Oregon case, which only cites Figuero Alvarez and they're not citing Circuit Court decisions. They're not citing the fact that the Eighth Circuit has specifically said you don't have to do a strict two step analysis.

It's not citing that there's been contradiction from other courts about what is and isn't there a Circuit Court anywhere, because I myself have been researching this since January and this issue has been coming up more, to imply or to

say that preponderance is the standard the Government has to meet.

But importantly, serious risk of flight even under White break down what that means. Flight, you're right, it does require something a little bit more active than risk of non-appearance. In part because some circuits have found that a risk of non-appearance would be if ICE arrested you. And the Government actually is causing your non-appearance.

Risk of flight means a single volitional act to avoid coming back to court. It would be as simple as staying in Los Angeles, but not going to your known residence. It would be as simple as when you promise the Court to be back at 9 a.m., you go the other direction.

Serious, even by all of the cases that defense cites, above average. And in so many of the cases that come before this Court, there's so many more significant mitigating factors about community ties, about people, about other things here, assets put up there, and a lot of the parts in all of these cases, aside from incentive to flee, which is the one thing that Mr. Chernis really focused on, length of residence and the type of residence, is that residence owned. All of those weigh against defendant.

Two years at the residence, the residence is a criminal location in a warehouse house not owned by her. Assets in this district, Mr. Chernis spoke to a lack of assets.

Ability to flee, it's not a U.S. passport that's being surrendered, it's a Chinese passport that's being surrendered. We would have no ability to ensure that the defendant didn't walk into the Chinese consulate, get a new travel card issued except for the promise that she would make to the Court.

So the question is, can the Court trust just a promise with nothing else? And in this case, the answer is simply no because of the significant lack of other ties, lack of assets, lack of people who are here, and I am sympathetic to the challenge and the concerns that other people might have about that, but we're still left with the fact that even in Mr. Chernis' whole argument, her world here was her co-conspirator.

Her only connection to this district, apparently, is the crime. That's what Mr. Chernis just told you. And the rest of the information that's used to mitigate that isn't verified. And that's why the Government struggled with this and we've repeatedly tried to help, give phone numbers from Ms. Yang's phone so Mr. Chernis could contact those people, try to find someone.

We've looked at and reviewed the information about the warrant, but I can't get over the fact that it was sent to an address that's the wrong address, because that was the address that was given. We've been working on this and like I'd already said and I truly mean it, if things change, we will

continue the conversation. But at this point, the Government can't point to anything that mitigates the risk of non-appearance and everything before Your Honor, irrespective of the standard, even if you incorrectly applied a preponderant standard shows a serious risk of flight even at the threshold.

**MR. CHERNIS:** I mean, I think if the Government wants to help, they could maybe have ICE back off a little bit on deporting people with no criminal histories.

**MS. LONG:** Your Honor, that is absolutely not within my control, nor is it within the control --

**THE COURT:** That's -- yeah.

**MS. LONG:** -- of the U.S. Attorney's Office.

**THE COURT:** Mr. Chernis, I think you diminish your argument --

**MR. CHERNIS:** Well --

**THE COURT:** -- by making an ad hominin --

**MR. CHERNIS:** -- if the Government is making it like it's really trying so hard to have my client released on bond, well if it wants my client released on bond, then it can stop objecting.

Your Honor, there's another -- there's some more authority that I forgot to mention that I think is also telling. It's not a 1326 case, it's actually a Ninth Circuit case, Lopez Valenzuela v Arpaio, 770 F3d 772.

And it states, and I quote, there is no evidence that

undocumented status correlates closely with unmanageable flight risk. The defendant --

**THE COURT:** Well, is that a 1326 case?

**MR. CHERNIS:** No, Your Honor.

**THE COURT:** Oh, you just said it's not. Okay.

**MR. CHERNIS:** No, it's not. It's actually a case -- it's a Ninth Circuit case from 2014 dealing with a law that was passed in Arizona that said people who are undocumented cannot get -- be released on bond.

**THE COURT:** Oh, okay. All right. But I guess -- I'll go ahead and take note of that case, go ahead and --

**MR. CHERNIS:** It goes on -- it just goes on to talk about the fact that people who are undocumented are no more likely to flee than people who are documented. And then, if I may, Your Honor, I can provide the Court with a Department of Justice report from March of 2022 which looked at pretrial release and misconduct in federal district courts from 2011 and 2018 and concluded, this is the Department of Justice, this is not me, concluded that undocumented non-U.S. citizens present a .5 percent failure to appear. U.S. citizens present a .9 percent rate of failure to appear.

So it's -- again it's so appealing, to focus on the undocumented status, but if this doesn't get you very far, Your Honor. And as far as the fact that Ms. Yang's information is not verified, I'm verifying it, I'm proffering it. I spoke to

three people who said we would love to help, but we don't want to be deported. They spoke to their immigration attorneys. Their immigration attorneys advised them not to help.

So, I mean, you know, there's only so much --

**THE COURT:** All right. Is there any --

**MR. CHERNIS:** -- that we can do. And again, when we talk about community ties, we just don't talk about California, we don't just talk about here. We talk about -- these cases talk about ties to the U.S.

**THE COURT:** All right. Thank you very much, Mr. Chernis.

So what I'm going to do is make the ruling with respect to serious risk of flight. As I see it, the factors you've -- that are identified in these decisions, incentive to flee, ability to flee, ties to the jurisdiction of the United States, reliability and trustworthiness of Ms. Yang.

And I will say to Ms. Yang and as I said as a threshold, and I hear what you're saying, and you're frustrating about these challenges with being able to verify and verify information and come forward with a surety, you know, each case is different but I do note that at least one other co-defendant who was in a different situation, able to verify, was released on bond. I do think that if you're able to clear that hurdle, this is a situation where I do think you could come back to the Court.

But with respect to serious -- having looked at this and scanned the cases, there's some tough hurdles putting aside the lack of immigration status, so even if I don't look at that --

**MR. CHERNIS:** Your Honor, the co-defendant has --

**THE COURT:** Can I just complete this? Yep.

I was just looking at some of the language that you cited here. Prior failures to appear, strongly predictable flight, generally they indicate a defendant's disregard of court orders. Where defendant has on one or more occasion an unexplained prior failure to appear, the Court may extrapolate that they made a similar intentional choice.

I hear what you're saying about the confusion, but it's always so difficult in that situation, I don't have that kind of mini trial on that, but I have a prior failure to appear, a warrant from that. It's puzzling, as part of the presentation, something that I thought was dismissed, it appears they now -- the district attorney has papered the DUI. I didn't realize it was a DUI involving injury to someone.

I take your point that there's prior marijuana use, I don't know and I don't -- you know, it looks like alcohol on the papering here.

**MS. LONG:** It was. It's a .20 blood level, you can see that in the complaint that Mr. Chernis handed up and injury to another person.

**THE COURT:** So I guess the prior -- the warrant for the prior failure to appear definitely goes to reliability and trustworthiness. The incentive to flee, six months versus I don't know, I don't have -- I don't know the guidelines --

**MR. CHERNIS:** I think the Government would agree that what I laid out is correct, she's looking at worst a 26 as a starting point.

**THE COURT:** So and I think that --

**MS. LONG:** I wouldn't agree with that, Your Honor. I wouldn't feel comfortable committing to the exact guideline. The base offense level would be a 26, but the statutory maximum for this crime is 20 years. I didn't want to speak to what she would face because I don't think --

**THE COURT:** No, no, we don't --

**MS. LONG:** -- it would be fair to do that at this point. But it's even, by Mr. Chernis' calculation four times the six months that he's comparing it to.

**THE COURT:** So I think that the -- I always find, Mr. Chernis, this one is difficult and I appreciate your -- what you say because I feel like in the Bar, you often will hear this, you know, how much time would you have to be facing for it to be daunting. It seems like it's more than six months.

**MR. CHERNIS:** It's maybe 24 months.

**THE COURT:** I don't think --

**MR. CHERNIS:** But, Your Honor, it's --

**THE COURT:** So but in any event, I find that it's not so slight, I feel like -- I mean, we don't know what it is, but I don't feel like it's so slight as maybe where you're looking at someone who's probably going the route of a 1325 even as opposed to a 1326. You know, you have a 1326 and you're often presented with the argument that -- even by the time we -- the person could make the first appearance in front of a district judge, you're like halfway through or more than halfway through what could be a sentence, right, they've already served it, but you have this concern of time served, maybe even by the arraignment.

I don't know what this case is going to be, but it doesn't appear that it's -- we're in that type of situation. And I recognize it's much more complicated, but I feel like having to make these decisions now with the limited information and I don't -- nobody wants to have to pre-fit, I don't think the statutory scheme calls for it. They can certainly have a review of it, where there's more opportunity to review it and flush it out.

Ability to flee, ties to the jurisdiction. I feel like this circles back to the challenges that are emerging from Ms. Yang with unverified information.

**MR. CHERNIS:** Wait, hang on a second, Your Honor.

**THE COURT:** And with respect --

**MR. CHERNIS:** The ability to flee, there's no, there's no facts here, no facts that would support a conclusion she has the ability to flee.

**THE COURT:** So I think everyone potentially has the ability to flee. The democratic lower case D version of me feels that that is always in a case. And I feel that here, I find here that the unverified information, the sureties, the challenges with the surety, weigh against Ms. Yang in that regard.

And I've addressed the reliability and trustworthiness. And so with that, I think I would like to now hear the argument on conditions. Mr. Chernis.

**MR. CHERNIS:** She will surrender her passport. Her passport is in her apartment at the residence that she was sharing at the warehouse. It's in a bag on a printer. She can surrender it within, you know, 24 hours of being released.

She will be on a $50,000 unsecured appearance bond. She will wear an ankle bracelet, Your Honor, so if you tries to go to the Chinese Consulate to get a passport, pretrial services can see that.

She will clear up the warrant in El Monte within 72 hours of her release, assuming or at least three business days. That would give her enough time to ensure that the attorney was retained and go to El Monte. It's very simple to get a warrant recalled when you appear there, it's very difficult to get a

warrant recalled when you're not there.

Her travel will be restricted to the Central District of California and her residence will be approved by pretrial services. The -- as far as the residence goes, I know the Government portrays it as the criminal center of this, but there was also -- there was a second story place where she had a residence. And it's what you might conjure up as being a residence in a warehouse, it sounds like it was a very nice room that she was living in, and she would like to stay there at least until she can find a different place, whether it's a hotel or another location. But again, that would be approved by pretrial services. That's all I have, Your Honor.

**THE COURT:** All right. Ms. Long, do you want to respond?

**MS. LONG:** Yes, Your Honor. Those conditions, nor others that would be available to the Court would be sufficient to mitigate for all of the reasons weighing to the fact that the defendant, now we're talking about a risk of non-appearance. So not returning to court as ordered, which is actually kind of a broader more nebulous thing than even serious risk of flight.

I've already I think addressed the concerns about the passport. Location monitoring is not perfect for many reasons. All of these conditions rely on something that even the Ninth Circuit has repeatedly said in decisions and I could provide

those in briefing, as much as it hurts me to offer that, but at the end of the day, all of these conditions including location monitoring rely on a promise, and this time, an unsecured promise. A promise without other consequences, a promise without other things on the line, of just saying trust me, I'll do it, the passport surrendering, the not getting a new one and the part of the issue of location monitoring is, if the residence again is going to be the same warehouse that I've now talked about so many times, but yes, she does live there, I'm not saying she didn't, but I'm emphasizing its connection to the crime because that has to do with its appropriateness.

Even if the location monitoring is home detention without permission to leave, it's not immediate. And I think Your Honor is familiar with that, in the sense that it's not like the marshals show up the moment that that ankle monitor moves a hundred feet or if it were to be cut.

I just two weeks ago had a case where an ankle monitor got cut and it was more than 24 hours before a warrant was even issued. And even then, or only if the marshals know where the person is can they go and get them.

By the time the ankle monitor is cut, if I'm remembering correctly the Ninth Circuit's wording on this, it's too late. And so the question is how can you trust that these things won't happen, that it will be abided by. And the Court doesn't have something before you to trust that.

And given there aren't other conditions, I think I've gotten through all of them, and I don't want to repeat the same things I've said repeatedly about the reason why there is a risk of flight, because those also do all apply to a risk of non-appearance.

**THE COURT:** All right. Anything else, Mr. Chernis?

**MR. CHERNIS:** No, Your Honor. I just -- I find it -- I thought we weren't supposed to talk about other cases and people cutting monitors off, because every case is different. I have a number of cases where people are on monitors and they're not cutting off their bracelets.

So just because something might happen, 1 percent of the situations doesn't mean it completely undermines the importance of wearing an ankle monitor. And if the Court would feel more comfortable with home detention, with some exclusions for -- I mean, sounds like she's going to be locked in a warehouse all day. Might as well stay at MDC, I'm just -- no, Your Honor, I'm just -- that's it. Thank you.

**THE COURT:** I get it. I get it, Mr. Chernis. It's frustrating.

I come back to where I started, it's the -- Ms. Yang. So we've been talking a lot and I can tell you've been paying attention. And what I said to Mr. Chernis at the beginning is something I continue to come back to throughout the hearing, that we call it unverified background information.

And what that means, it's kind of a fancy way that we talk here in court, is the folks at pretrial have taken your information and they're just trying to call somebody, find someone who can say, yes, that's correct. And not put anything on the line, but say, yes, that's correct. And they have not been able to do that. So that's a challenge here for me in being able to set conditions.

It sounds like it's also been I think a challenge for the Government to be able to agree or work with Mr. Chernis on setting bond conditions and it's pretty unusual for someone -- for me, at least, I can't speak for everybody, for me to agree to conditions when I don't have the background information verified.

**MR. CHERNIS:** Excuse me, Your Honor, what could be verified?

**THE COURT:** So --

**MR. CHERNIS:** I don't understand what could be verified that would make a difference.

**THE COURT:** So let me just go ahead and finish, Mr. Chernis. Because I do -- I like to talk to the individuals to make sure that they have an understanding. A lot of times I feel like that doesn't happen and that the clients are puzzled, I'm not saying that's your situation, Mr. Chernis, but it has been my observation. And so I've adopted a habit to try to be as direct and transparent and candid.

So being able to talk for pretrial, which is part of the court, being able to talk to folks who can confirm the information that you -- that is in front of me in this report, and it might sound like, but you know, I've already told pretrial, why don't you believe me, it's not that we're not believing you, it's just that this is the process that we go through every day here in court.

So that's one challenge here. The other one is being able to come up with what he call like a resource for bail, it's again another legal term. You may have heard the term surety, I don't know how that gets translated, but I'll often say is there a surety, talk to me about the sureties, who is willing to sign a piece of paper on your behalf.

I hear very much what your attorney is arguing that in a situation where if maybe people are concerned about coming forward with the federal government, they don't want to put their name out there. They don't want to sign a piece of paper. I hear that. And I think that if we were in a situation where we could get information confirmed and, Mr. Chernis, you could come to me I found some people, I've got this place proposed, but more I would take a serious look at this.

But it sounds like that -- at least in the past week that this has been happening, that hasn't been able to be accomplished. And I know that your attorney has worked very

hard. He has a lot of experience, he has a great reputation and in this court, you saw here how strongly he was fighting for you. But those are really again, where I started with, Mr. Chernis, I keep coming back to that.

A lot of the argument, not a lot, but a good portion of our argument concerned a legal issue. I may have gotten it wrong and if I did, you can talk to Mr. Chernis because I don't have the last say. You can take this to the -- what's called a district judge, who can review. The district judge can say, Judge Oliver got it all wrong and I'm going to rule consistent or in favor of what Mr. Chernis is arguing. So I want to make sure you understand that, that I don't have the last say and Mr. Chernis can order a transcript of this and decide to what's called a PEWT to the district judge.

Again, I hope that this is understandable. It's a lot of technical legal arguments that we've had here today, but maybe the best thing to just say is I hope you remember that you can talk to your attorney and you can go to another judge and say, hey, we think she got it wrong, so hear us. Hear our arguments again. Okay?

I think what I'd like to do is we need to set dates. So I'd like to go ahead and proceed with that. If you want to place anything else on the record either attorney, we can do that now before we set the dates.

**MR. CHERNIS:** Yes, Your Honor. I mean -- and I

apologize for interrupting, I'm a little right now, but on this issue of data being verifiable, I don't exactly know what the Government wants to verify. But if the Government wants to verify that she went to school at Temple, the Government and pretrial services can do that.

If the Government -- I mean, in fact, I know that Mr. Scott verified that she was living in Philadelphia when I said she was. If the Government wants to verify where she was living after that in Delaware, I can provide an address.

If pretrial services or the Government want to verify with co-defendant Twang, I mean, I don't know exactly what we're verifying here.

**THE COURT:** Well, Mr. Chernis, that's something first of all we had a week, right, so you could have, right, talked to Ms. Long, attempted to do that --

**MR. CHERNIS:** Talk to Ms. who?

**MS. LONG:** Me.

**THE COURT:** Ms. Long.

**MR. CHERNIS:** No, I spoke to her --

**THE COURT:** About --

**MR. CHERNIS:** -- partner Mr. Scott --

**THE COURT:** Oh, Mr. Scott.

**MR. CHERNIS:** -- and this -- but it keeps coming up this unverified data. I guess I don't know -- it sounds like she's claiming that she was working for a restaurant for six

years, like the data that would be relevant to be verified is basically where she was living and for how long. If that moves the needle, great. I can't speak to her friend or her friend's wife, who are her main people here because they're co-defendants.

So the Government if they really want to help, they can get that information. They can speak to them.

**THE COURT:** Well, I guess what I --

**MS. LONG:** No, I can't, Your Honor, he's a represented party.

**THE COURT:** No, I don't think they can't speak to the co-defendants. Look, I think --

**MR. CHERNIS:** Well, they should speak to the attorneys.

**THE COURT:** Mr. Chernis, you're experienced, you can work with pretrial to attempt to verify this. And if you're able to do that, then you can either --

**MR. CHERNIS:** I'm asking pretrial --

**THE COURT:** -- take it to --

**MR. CHERNIS:** -- to do that now.

I mean, I didn't communicate with them before because I didn't have surety information, but since verification seems to be -- and I'll follow it up in an e-mail but.

**THE COURT:** Right. But I think that that's -- I think work that can happen. It can still happen. It can still

happen.

**MR. CHERNIS:** If you want to set dates, go ahead.

**THE COURT:** All right. Anything else from the Government? Anything that you want to put on the record?

**MS. LONG:** Your Honor, a waiver of preliminary hearing was filed.

**THE COURT:** Oh.

**MS. LONG:** So I just wanted to let you know so in terms of setting the dates, I think we'd be setting the post indictment arraignment only. I believe that the co-defendants are set at September 11th at 11:30 a.m. I'm not sure if that's helpful to you for this purpose of setting this date. I don't think it really matters if this post indictment arraignment is set at the same date and time.

**THE COURT:** All right. Let me just -- so I did a quick look. I didn't see the preliminary hearing waiver.

**MS. LONG:** I believe it was e-mailed to intake because there still wasn't access to the docket yet, so it couldn't be filed just on the docket. And intake, I believe confirmed receipt of that.

**THE COURT:** Okay.

**MS. LONG:** I know it was last week. I don't remember what day last week it was, if it was Wednesday or Thursday.

**THE COURT:** Okay. It looked like it didn't make its way into the file. Sorry about that, Mr. Chernis.

**MR. CHERNIS:** Yeah, I mean I could -- if you -- I don't think I have a copy with it now, but if you want to give me a minute, Your Honor, I can find the e-mail in my --

**THE COURT:** Of course, absolutely.

**MS. LONG:** I could forward it to the courtroom deputy if that works.

**MR. CHERNIS:** We definitely sent it to intake last --

**THE COURT:** Oh, I'm sure you did.

**MR. CHERNIS:** So we're setting a post indictment arraignment. Is there another date we're setting also?

**THE COURT:** Not if we take the preliminary hearing waiver.

**MR. CHERNIS:** So it was sent on August 8th.

**MS. LONG:** Mr. Ramirez, I just forwarded it to you.

**THE CLERK:** Yes, ma'am.

**MR. CHERNIS:** And then I think on August 8th intake acknowledged it had been processed so.

**THE COURT:** Just it didn't -- no, I believe all of that. Trust me I believe all of that happened. It just --

**MS. LONG:** I think intake's been going through a lot the last week.

**THE COURT:** They've been going through a lot.

**MS. LONG:** With the feeling and all of those things, so.

**THE CLERK:** Nothing was attached.

**MS. LONG:** Oh, let me -- sorry. I think I forwarded you the one without an attachment. Let me send it again.

**(Pause)**

**MS. LONG:** I just sent you what was sent to intake. I don't think intake responded with like document with the lodged or filed or whatever stamp they put on it.

**THE COURT:** Oh, okay.

**THE CLERK:** With the date I'll file stamp it.

**MR. CHERNIS:** No, but I have an e-mail that I could forward you that basically -- from intake saying the document has been processed.

**MS. LONG:** That's what Mr. Ramirez already has.

**THE COURT:** I believe it. So I believe the intake has not just -- they've gone through a lot and there's been a lot of turnover over the past year and so it's just been a really -- a difficult, I think this whole year has been difficult for the intake folks.

**THE CLERK:** It was sent on August 8th, correct, to intake?

**MR. CHERNIS:** Yes.

**MS. LONG:** Yes. I believe the signature date is August 7th, the day before.

**THE COURT:** All right. Do you mind printing a copy for Mr. Chernis so that he can show it to his client as I'm inquiring? Thank you very much.

**(Pause)**

**THE COURT:** Thank you.

It's your signature?

**THE DEFENDANT:** Correct. It's all mine.

**THE COURT:** Okay. So I apologize, Mr. Chernis, for not having that here in the file.

All right. Ms. Yang, I'm looking at the same paperwork, the waiver of preliminary hearing. It looks like it was translated into Mandarin for you. You just indicated that that's your signature. I just need to ask you a couple of questions.

So the form indicates -- your signature indicates that you want to waive or give up your right to a preliminary hearing. And I just need to make sure that you've had enough time to talk to your attorney and you've had enough time to think about that.

So the first question is, have you had enough time to talk to Mr. Chernis about your right to a preliminary hearing?

**THE DEFENDANT:** Yes.

**THE COURT:** Do you understand that if you waive a right to a preliminary hearing, then the hearing won't occur. Do you understand that?

**THE DEFENDANT:** Yes, I understand.

**THE COURT:** Do you need any more time to think about waiving your right or do you feel comfortable waiving your

right here today in court?

**THE DEFENDANT:** I don't need any more time.

**THE COURT:** Okay. All right. So, Ms. Yang, is it your desire to waive your right to a preliminary hearing in this case?

**THE DEFENDANT:** Yes.

**THE COURT:** Okay. Thank you.

Having inquired of Ms. Yang, I find that her waiver of preliminary hearing is knowingly and voluntarily made and the Court accepts the waiver. The post indictment arraignment is set for September 11, 2025 at 11:30 a.m. And that'll be in the duty courtroom, courtroom 640.

Pursuant to the due process protections at -- the Government is ordered to comply with its obligations to produce exculpatory evidence pursuant to Brady v Maryland and its progeny and is reminded of the possible consequences of violating the law and this order, including exclusion of evidence, adverse jury instructions, dismissal of some or all of the charges with or without prejudice, contempt and/or sanctions. Understood, Ms. Long?

**MS. LONG:** Understood, Your Honor.

**THE COURT:** Okay. Anything else, Mr. Chernis, that you wanted to do this morning?

**MR. CHERNIS:** I just wanted to put on the record, Your Honor, that part of the disclosure obligation I'm not sure

they can comply with it in 14 days. We are requesting a copy of a full Cellebrite extraction from Ms. Yang's phone.

**THE COURT:** All right. Did you get that Ms. Long?

**MS. LONG:** I heard it, Your Honor.

**THE COURT:** Okay. All right.

**MS. LONG:** Well, Your Honor, these are contradictory things. If he wants a full extraction, our typical practice is to try to comply with that, but now he's asking me to translate gigabytes worth of data. That's neither a discovery request that's proper nor is any of that actually --

**THE COURT:** Appropriate.

**MS. LONG:** -- within the disclosures you just said or properly before this Court.

If Mr. Chernis wants to make a discovery request, I suggest that he do it in writing. I wrote this down already, that's exactly what I was doing when the English request came. The in English, I can't pretend to try to comply with and certainly not right now.

But any translations the Government does make ourself of this, we will provide that if he agrees to, for example, the draft translation agreement that we use every single day in discovery of our cases.

**THE COURT:** So the beauty of this is I know that you can all take this up in front of the district judge, that I have no authority when it comes to that.

**MR. CHERNIS:** I just wanted to see what was going to happen.

**THE COURT:** Oh, okay.

**(Pause)**

**THE COURT:** There's also advocate. I appreciate that. All right. We're adjourned.

**MR. CHERNIS:** Thank you, Your Honor, for the time.

**(Proceedings concluded at 10:25 a.m.)**

*** * * * ***

4

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

Toni Hudson

**September 10, 2025**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***